1  SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
2  Alan R. Plutzik, Of Counsel (Bar No. 077785)
   Robert M. Bramson, Of Counsel (Bar No. 102006)
3  2125 Oak Grove Road, Suite 120
   Walnut Creek, California 94598
4  Telephone: (925) 945-0770
   Facsimile: (925) 945-8792
5
   -and-
6
   Joseph H. Meltzer, Esq.
7  Edward W. Ciolko, Esq.
   Mark K. Gyandoh, Esq.
8  Joseph A. Weeden, Esq.
   280 King of Prussia Road
9  Radnor, PA 19087
   Telephone: (610) 667-7706
10 Facsimile: (610) 667-7056
11 Attorneys for Plaintiffs
12 [Additional Counsel Listed on Signature Page]
13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15
                  SAN FRANCISCO/OAKLAND DIVISION
16

| | |
|---|---|
| ANDREA KAY and DANIEL MYFORD, , individually and on behalf of all others similarly situated, | Civil Action No. C07-01351 WHA |
| Plaintiffs, | JURY TRIAL REQUESTED |
| v. | |
| WELLS FARGO BANK, N.A., NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY | Class Action |
| Defendants. | |

24                    **FIRST AMENDED COMPLAINT**
25
26
27
28

FIRST AMENDED COMPLAINT

51403

1        Plaintiffs Andrea Kay and Daniel Myford ("Plaintiffs"), on behalf of themselves and a class

2 of all others similarly situated, allege as follows:

3                          **INTRODUCTION**

4      1.      Defendants are each subsidiaries of Wells Fargo & Company, one of the nation's

5 largest financial services companies. Wells Fargo Bank, N.A., together with certain participating

6 subsidiaries and/or affiliates, and under various trade names (collectively referred to herein as

7 "Wells Fargo " or the "Company") has acted in concert with its affiliated reinsurer, North Star

8 Mortgage Guaranty Reinsurance Company ("North Star") to effectuate a scheme whereby, in

9 violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (a) illegal referral

10 payments in the form of purported reinsurance premiums are paid by private mortgage insurers to

11 North Star; and (b) Wells Fargo receives an unlawful split of private mortgage insurance premiums

12 paid by its borrowers.

13      2.      This is a proposed national class action brought by Plaintiffs on behalf of

14 themselves and a class of all other similarly situated homeowners who obtained residential

15 mortgage loans through Wells Fargo or any of its subsidiaries and paid for private mortgage

16 insurance issued by insurers with whom Wells Fargo had captive reinsurance arrangements.

17      3.      Homeowners who buy a home with less than a 20% down payment are typically

18 required to pay for private mortgage insurance. Private mortgage insurance protects the lender in

19 the event of a default by the borrower. The premium is paid by the borrower and is usually

20 collected by the lender with the borrower's monthly payments. Borrowers typically have no

21 opportunity to comparison-shop or select the private mortgage insurer.

22      4.      Section 2607 of RESPA prohibits lenders from accepting kickbacks or referral fees

23 from any person providing a real estate settlement service, including providers of private mortgage

24 insurance. Thus, a lender cannot legally accept a referral fee from the insurer issuing the private

25 mortgage insurance policy on the borrower's home.

26      5.      Wells Fargo has attempted to circumvent RESPA's prohibition against accepting

27 kickbacks and unearned fees by arranging for the private mortgage insurer to pay an excessive

28

---

FIRST AMENDED COMPLAINT
51403

1   portion of borrowers' private mortgage insurance premiums to North Star in the form of purported

2   reinsurance premiums.

3       6.      While these payments to Wells Fargo's wholly-owned subsidiary were purportedly

4   for "reinsurance" services, North Star received these payments while assuming very little or no

5   actual risk. For instance, from 1999 through 2005, Wells Fargo's captive reinsurer received well

6   over **$325 million** from leading primary mortgage insurers as its "split" of borrowers' mortgage

7   insurance premiums--$72 million in 2005 alone. In stark contrast, its actual insurance losses as

8   reflected in the total amount of claims paid with respect to such premiums were **zero**. In other

9   words, the millions of dollars collected by Wells Fargo through its captive reinsurance

10  arrangements far exceeded the value of any services rendered.

11      7.      This scheme constitutes disguised, unlawful referral fees in violation of RESPA's

12  anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of

13  settlement-service fees other than for services actually performed.

14                              **JURISDICTION AND VENUE**

15      8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

16  1331 and 1367 and 12 U.S.C. § 2614.

17      9.      Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614

18  because the real property involved in one or more of Plaintiffs' mortgage loan transactions is

19  located in this district, Defendants reside in this district and a substantial part of the events giving

20  rise to the claims occurred in this district .

21                                      **PARTIES**

22  **Plaintiffs**

23      10.     Plaintiff Andrea Kay resides in San Francisco, California. In August 2006, Plaintiff

24  Kay obtained a residential mortgage loan from Wells Fargo for the purchase of a home, with a

25  downpayment of less than 20%, and was required to pay for primary mortgage insurance. Plaintiff

26  Kay paid for primary mortgage insurance from an insurer with whom Wells Fargo had a captive

27  reinsurance arrangement.

28

FIRST AMENDED COMPLAINT
51403

2

1    11.    Plaintiff Daniel Myford resides in Evans City, Pennsylvania.  In September 2006,

2    Plaintiff Myford obtained a residential mortgage loan from Wells Fargo for the purchase of a

3    home, with a downpayment of less than 20%, and was required to pay for primary mortgage

4    insurance.  Plaintiff Myford paid for primary mortgage insurance from an insurer with whom Wells

5    Fargo had a captive reinsurance arrangement.

6    **Defendants**

7    12.    Defendants Wells Fargo Bank, N.A. is a national banking association chartered in

8    Sioux Falls, South Dakota and headquartered in San Francisco, California.

9    15.    Defendant North Star is a Vermont corporation.

10    **FACTUAL ALLEGATIONS**

11    **Wells Fargo's Operations**

12    16.    Wells Fargo & Company is a financial services holding company and, through its

13    numerous subsidiaries, operates in a variety of retail, corporate and commercial banking and

14    related financial services business.

15    17.    Wells Fargo Bank, N.A. is the principal banking subsidiary of Wells Fargo &

16    Company.  As of December 31, 2006, Wells Fargo Bank, N.A. had assets of nearly $400 billion,

17    representing approximately 83% of the assets of Wells Fargo.

18    17.    Wells Fargo originates residential mortgage loans through its home loan division,

19    known as "Wells Fargo Home Mortgage," headquartered in Des Moines, Iowa.  Through its home

20    mortgage division—which generated nearly $4.2 billion in revenue in 2006 alone—Wells Fargo is

21    one of the nation's largest originators of residential mortgage loans.

22    18.    Wells Fargo originates and funds mortgage loans through numerous retail branches,

23    the internet (including the website: https://www.wellsfargo.com/mortgage), as well as other

24    methods, including sourcing loans through a network of outside mortgage brokers.  Additionally,

25    the Company originates and funds mortgage loans through unconsolidated joint ventures with

26    affiliates companies of which the Company owns an interest of 50% or less.

27    19.    Wells Fargo operates over 6000 retail stores and has approximately 158,000

28    employees.

FIRST AMENDED COMPLAINT
51403

3

21.     Through its subsidiary North Star, Wells Fargo enters into agreements to provide purported reinsurance services to primary private mortgage insurance providers with respect to mortgage loans originated, funded and/or serviced by Wells Fargo.

**Private Mortgage Insurance Industry**

24.     In order to lessen risk of default, lenders typically prefer to finance no more than eighty percent of the value of a home, with the remaining twenty percent being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

25.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home. Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party -- the private mortgage insurer -- to protect the lender in the event of a default by the borrower.

26.     Private mortgage insurers are typically unaffiliated third-party companies who agree to cover the first twenty to thirty percent of the amount of the potential claim, including unpaid principal, interest and certain expenses.

27.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the more mortgage insurance required.  For example, more private mortgage insurance is required with a five percent down payment than with a fifteen percent down payment.  Additionally, more private mortgage insurance may be required for adjustable-rate mortgages than for fixed-rate mortgages.

28.     While the lender is the beneficiary of the private mortgage insurance, the borrower pays the premiums, usually through an addition to the borrower's monthly mortgage payment.

29.     Borrowers generally have no opportunity to comparison-shop for private mortgage insurance.  The private mortgage insurer is selected by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, is determined by the lender and the private mortgage insurer, rather than negotiated between the borrower and the private mortgage insurer.

30.     The private mortgage insurance industry began with the founding of Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and is dominated by MGIC and other companies,

including, without limitation:  PMI Mortgage Insurance Company, Genworth Mortgage Insurance

Corporation, Radian Guaranty Inc., United Guaranty Residential Insurance Company, Triad

Guaranty Insurance Company and Republic Mortgage Insurance.  The industry is represented by a

trade association known as Mortgage Insurance Companies of America ("MICA").

31.     According to MICA, new private mortgage insurance contracts for its member firms

have consistently exceeded $200 billion per year since 1998.  MICA firms issued over 1.5 million

new certificates of mortgage insurance in 2005, representing over $225 billion in new insurance

written.

32.     Private mortgage insurance is limited to the conventional home loan market.

Mortgage loans directly insured by the federal government via mortgage guaranty programs, such

as those maintained by the Federal Housing Administration and the Veterans Administration,

maintain their own form of mortgage default insurance.

**RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related To
Private Mortgage Insurance Policies**

33.     RESPA is the primary federal law regulating residential mortgage settlement

services.  The United States Department of Housing and Urban Development ("HUD") is charged

with enforcing RESPA.  HUD has promulgated the implementing rules for RESPA.  See

Regulation X, 24 C.F.R. § 3500.

34.     RESPA was enacted, in part, to curb the problem of kickbacks between real estate

agents, lenders and other real estate settlement service providers.  "It is the purpose of this chapter

to effect certain changes in the settlement process for residential real estate that will result…**(2) in**

the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain

settlement services."  12 U.S.C. § 2601(b).

35.     A key component of RESPA is its dual prohibition of referral fees and fee-splitting

between persons involved in real estate settlement services.

36.     In 12 U.S.C. 2607(a) RESPA provides:

> No person shall give and no person shall accept any fee, kickback, or thing
> of value pursuant to any agreement or understanding, oral or otherwise, that
> business incident to or a part of a real estate settlement service involving a
> federally related mortgage loan shall be referred to any person.

FIRST AMENDED COMPLAINT
51403

5

37. In 12 U.S.C. 2607(b) RESPA provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

38. Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

39. The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity...The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

40. Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a). The term "settlement service" is liberally defined in RESPA and Regulation X and includes the "provision of services involving mortgage insurance." 24 C.F.R. § 3500.2(b).

41. Under RESPA, therefore, Wells Fargo is prohibited from accepting referral fees from a private mortgage insurer or from splitting private mortgage insurance premiums with the insurer other than for services actually performed by the captive reinsurer.

**Mortgage Reinsurance Industry**

42. Private mortgage insurers may enter into contracts with reinsurers, whereby the reinsurer typically agrees to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans. In return, the private mortgage insurer pays to the reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

1

2

43.     Mortgage reinsurance arrangements can generally take two forms: (a) "quota share" and (b) "excess loss."

3

4

5

6

44.     In a quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences losses, the reinsurer is certain to experience losses in the percentage agreed upon in the reinsurance coverage.

7

8

9

45.     In an excess loss reinsurance arrangement, however, the reinsurer is liable only for claims, or a percentage thereof, above a particular ceiling.  Unlike the quota share arrangement, the excess loss method does not necessarily result in any loss being shifted to the reinsurer.

10

11

12

13

46.     The likelihood of the reinsurer experiencing any losses under this arrangement depends not only on the amount of losses by the private mortgage insurance, but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer sets the excess loss level at an amount where the reinsurer bears actual risk of loss.

14

15

**Captive Mortgage Reinsurance Arrangements and HUD's Concern About RESPA Anti-kickback Violations Under Such Arrangements**

16

17

18

19

20

47.     Lenders produce customers for private mortgage insurers.  Certain lenders, seeking to capitalize on the billions of dollars their borrowers pay to these insurers in premiums each year, have established their own affiliated or "captive" reinsurers.  These captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates that require the borrower to pay for private mortgage insurance.

21

22

23

24

48.     Under "captive reinsurance arrangements," the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer.

25

26

27

49.     Captive mortgage reinsurance arrangements raise obvious RESPA kickback problems.  Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the borrower's premium revenue

28

FIRST AMENDED COMPLAINT
51403

1   through its captive reinsurer.  The insurer stimulates its business by providing a lucrative stream of

2   revenue for the lender via the lender's captive reinsurer.

3       50.     Simply put, as opposed to receiving direct payments for referring its customers to a

4   certain private mortgage insurer, an unscrupulous lender can use a captive reinsurance arrangement

5   to funnel such unlawful kickbacks.

6       51.     Concerned that these transactions would be designed to disguise a funneling of

7   referral fees back to the lender who arranged for the private mortgage insurer to obtain the

8   business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of

9   captive reinsurers and RESPA's anti-kickback violations.

10      52.     The HUD letter concluded that captive reinsurance arrangements were permissible

11  under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services

12  'actually furnished or for services performed' and (2) are bona fide compensation that does not

13  exceed the value of such services" (emphasis in original).

14      53.     The HUD letter focuses the RESPA anti-kickback analysis on whether the

15  arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a

16  real transfer of risk." HUD warned that "The reinsurance transaction cannot be a sham under which

17  premium payments... are given to the reinsurer even though there is no reasonable expectation that

18  the reinsurer will ever have to pay claims."

19      54.     The HUD letter states "This requirement for a real transfer of risk would clearly be

20  satisfied by a quota share arrangement, under which the reinsurer is bound to participate pro rata in

21  every claim" (emphasis in original).

22      55.     The HUD letter contrasts the excess loss method of reinsurance.  HUD states that

23  excess loss reinsurance contracts can escape characterization as a referral fee or fee-split only:

24          ...if the band of the reinsurer's potential exposure is such that a reasonable
            business justification would motivate a decision to reinsure that band.
25          Unless there is a real transfer of risk, no real reinsurance services are
            actually being provided. In either case, the premiums paid...must be
26          commensurate with the risk.

27      56.     Notably, state insurance commissioners and federal regulators have investigated and

28  condemned similar captive reinsurance arrangements in the title insurance industry as sham

FIRST AMENDED COMPLAINT                                                                    8
51403

transactions designed to funnel unlawful kickbacks for business referrals. As a result, a number of providers have abandoned such arrangements altogether.

57.     The National Association of Insurance Commissioners ("NAIC") also has addressed the accounting treatment of premiums ceded to captive mortgage reinsurers. Under the annual statement requirements of the NAIC, private mortgage insurers should not treat as authorized reinsurance amounts ceded to lender-captive reinsurers where adequate risk is not transferred. Rather, such amounts should be accounted for under the less beneficial deposit accounting guidelines and identified as though unauthorized accounting was being utilized.

### Wells Fargo's Captive Reinsurance Arrangements

58.     In connection with the billions of dollars in home loans originated by Wells Fargo, many of its borrowers pay for private mortgage insurance.

59.     Wells Fargo enters into "captive reinsurance arrangements," whereby it refers its borrowers to private mortgage insurers, who agree to reinsure with North Star. These insurers include at least: PMI Mortgage Insurance Company, Genworth Mortgage Insurance Corporation, Mortgage Guaranty Insurance Company, Radian Guaranty Inc., United Guaranty Residential Insurance Company, Triad Guaranty Insurance Company and Republic Mortgage Insurance.

60.     Wells Fargo has a strong financial interest in steering business to private mortgage insurers who, in turn, agree to reinsure with North Star on terms that will produce significant kickbacks to Wells Fargo.

61.     North Star enters into reinsurance agreements solely with respect to loans originated by Wells Fargo.

62.     Under Wells Fargo's captive reinsurance arrangements, the primary insurer pays North Star a percentage of the premiums paid by borrowers on a particular pool of loans; in return, North Star purportedly agrees to assume a portion of the insurer's risk with respect to the loans involved.

63.     In fact, little or no risk is actually transferred from the primary insurer to North Star in exchange for the insurer payments to North Star. The actual risk, if any, transferred to North Star is not commensurate with the premiums it extracts from the private mortgage insurer.

FIRST AMENDED COMPLAINT
51403

9

64.     The numbers speak for themselves.  For instance, from 1999 through 2005, Wells Fargo's captive reinsurer has collected from private mortgage insurers approximately **$325,684,000** as its "share" of borrower's private mortgage insurance premiums.  In contrast, its "share" of paid insured losses with respect to such premiums was **zero**:

| YEAR | PREMIUMS RECEIVED BY REINSURER | LOSSES PAID BY REINSURER |
|---|---|---|
| 2005 | $72,053,000 | $0 |
| 2004 | $73,578,000 | $0 |
| 2003 | $62,840,000 | $0 |
| 2002 | $73,578,000 | $0 |
| 2001 | $31,185,000 | $0 |
| 2000 | $12,450,000 | $0 |
| **TOTAL:** | **$325,684,000** | **$0** |

65.     This clear, disturbing pattern of excessive premiums compared to the actual transferred risk continued throughout 2006.

66.     As HUD noted during its recent testimony by Assistant Secretary for Regulatory Affairs and Manufactured Housing Gary M. Cunningham before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

66.     The millions of dollars collected by Wells Fargo through its captive reinsurer have clearly not been commensurate to its actual risk exposure.  The Company has received millions of dollars in payments, while bearing little or no risk of loss.

67.     In reality, Wells Fargo's captive reinsurance arrangements were and are sham transactions for collecting illegal kickbacks in return for referring private mortgage insurance business to certain insurers.

68.     The money Wells Fargo collected through its captive reinsurer far exceeded the value of the services, if any, it performed.  There was no real transfer of risk or, at least, not a commensurate transfer of risk.  The amounts paid were simply disguised kickbacks to Wells Fargo for the referral of borrowers to private mortgage insurers.

69.     These arrangements keep premiums for private mortgage insurance artificially inflated because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders.  In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage *and* private mortgage insurers' unlawful kickbacks to lenders.

70.     Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers.  As a result, private mortgage insurance premiums incorporate the payment of such kickbacks -- to the detriment of consumers.

## CLASS ACTION ALLEGATIONS

71.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of a general class consisting of all persons who obtained residential mortgage loans originated and/or acquired by Wells Fargo and/or its affiliates and, in connection therewith, purchased private mortgage insurance and whose loans were included within Wells Fargo's captive mortgage reinsurance arrangements (the "Class").

72.     The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

73.     The Class is so numerous that joinder of all members is impracticable.

74.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

75.     Plaintiffs' claims are typical of the claims of the Class.

FIRST AMENDED COMPLAINT
51403

11

76.     There are questions of law and fact common to the Class, including but not limited to:

    a.    Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

    b.    Whether payments to Wells Fargo's captive reinsurer were *bona fide* compensation and solely for services actually performed;

    c.    Whether payments to Wells Fargo's captive reinsurer exceeded the value of any services actually performed;

    d.    Whether Wells Fargo's captive reinsurance arrangements constituted unlawful kickbacks from private mortgage insurers;

    e.    Whether Wells Fargo accepted a portion, split or percentage of borrowers' private mortgage insurance premiums other than for services actually performed; and

    f.    Whether Defendants are liable to Plaintiffs and the Class for statutory damages pursuant to RESPA § 2607(d)(2).

77.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

78.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel competent and experienced in complex nationwide class action litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

79.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants.

80.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

1    81.    Class action status is also warranted under Rule 23(b)(2) because Defendants have

2    acted or refused to act on grounds generally applicable to the class, thereby making appropriate

3    final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

4    82.    Class action status is also warranted under Rule 23(b)(3) because questions of law

5    or fact common to the members of the class predominate over any questions affecting only

6    individual members, and a class action is superior to other available methods for the fair and

7    efficient adjudication of this controversy.

8    ## CLAIMS FOR RELIEF

9    ## COUNT I

10   ## VIOLATION OF RESPA, 12 U.S.C. § 2607

11   83.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were

12   fully set forth herein.

13   84.    Throughout the Class Period, Wells Fargo provided "settlement services" in respect

14   of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

15   85.    The amounts received by Wells Fargo through its captive reinsurance arrangements

16   constituted "things of value" within the meaning of RESPA § 2602(2).

17   86.    Plaintiffs and the Class obtained federally-related residential mortgage loans

18   through Wells Fargo and paid millions of dollars for private mortgage insurance premiums in

19   connection with their real estate closings. Defendants arranged for an unlawfully excessive split of

20   borrowers' premiums to be paid to North Star.

21   87.    The millions of dollars in premiums accepted from private mortgage insurers: (a)

22   were not for services actually furnished or performed; and/or (b) exceeded the value of such

23   services.

24   88.    The millions of dollars accepted by Wells Fargo through its captive reinsurance

25   arrangements constituted fees, kickbacks or things of value pursuant to agreements with private

26   mortgage insurers that business incident to real estate settlement services involving federally-

27   related mortgage loans would be referred to such insurers. Such practice violated RESPA, 12

28   U.S.C. 2607(a). North Star—Wells Fargo's subsidiary—participated in the scheme and served as

FIRST AMENDED COMPLAINT
51403

13

the direct conduit by which the kickbacks were funneled. North Star agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiffs and the Class.

89.     In connection with transactions involving federally-related mortgage loans, Wells Fargo accepted a portion, split or percentage of charges received by private mortgage insurers for the rendering of real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b). The money paid by private mortgage insurers to Wells Fargo and accepted by Wells Fargo through its captive reinsurer was a portion, split or percentage of the private mortgage insurance premiums paid by Wells Fargo's customers. North Star—Wells Fargo's subsidiary—participated in the scheme and served as the direct party to which the split was paid. North Star agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiffs and the Class.

90.     Plaintiffs and the Class were harmed by Defendants' unlawful kickback scheme.

91.     First, Plaintiffs and the Class were overcharged for mortgage insurance. Kickbacks and unearned fees unnecessarily and artificially inflate settlement service charges. Under Wells Fargo's scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to Wells Fargo's captive reinsurer that far exceeded the value of any services performed and, were, in fact, illegal referral fees.

92.     Second, *regardless* of whether Plaintiffs and the Class were overcharged for private mortgage insurance, and *regardless* of the reasonableness or unreasonableness of the rates Plaintiffs paid for private mortgage insurance, under RESPA, Plaintiffs and the Class were, as a matter of law, entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes. Congress has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties.

93.     Defendants therefore violated RESPA, 12 U.S.C. 2607. Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are liable to Plaintiffs and the Class in an amount equal to three times

1    the amounts they have paid or will have paid for private mortgage insurance as of the date of

2    judgment.

3         94.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiffs also seek attorneys' fees

4    and costs of suit.

5                          **TOLLING OF STATUTE OF LIMITATIONS**

6         95.    Defendants knowingly and actively concealed the basis for the Plaintiffs' claims by

7    engaging in a scheme that was, by its very nature and purposeful design, self-concealing. Due to

8    the complex, undisclosed and self-concealing nature of Wells Fargo's scheme to collect illegal

9    kickbacks from private mortgage insurers, Plaintiffs and the Class could not reasonably have

10   discovered the underlying basis for the claims alleged herein.

11        96.    Further, Wells Fargo engaged in affirmative acts to conceal the facts and

12   circumstances giving rise to the claims asserted herein. Wells Fargo affirmatively represented to

13   Plaintiffs and the Class that any amounts it received from its captive reinsurance arrangements

14   were for services actually performed. Pursuant to RESPA § 2604(c) and the accompanying

15   regulations set forth in 24 C.F.R. 3500.7, if Wells Fargo required the use of a particular provider of

16   settlement service, it was obligated to describe the nature of any relationship between Wells Fargo

17   and such provider. Wells Fargo failed to satisfy its disclosure obligations by impermissibly

18   misrepresenting the true nature of its captive reinsurance arrangements with private mortgage

19   insurers—particularly the fact that the amounts that Plaintiffs and the Class would pay to such

20   insurers included payments to Wells Fargo's captive reinsurer in excess of the value of any

21   services rendered.

22        97.    Wells Fargo provided misleading information to Plaintiffs and the Class, thus

23   affirmatively acting to conceal its unlawful kickback scheme. By funneling kickbacks through

24   North Star and representing that such payments were for services actually performed, rather than

25   referral fees, Wells Fargo acted to conceal and prevent Plaintiffs from discovering the underlying

26   basis for this action.

27

28

1    98.    Accordingly, Plaintiffs and the Class contend that it would be inequitable for the

2    Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way

3    that would preclude the claim of any Plaintiff or Class member.

## PRAYER FOR RELIEF

5    WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and

6    in favor of Plaintiffs and the Class and award the following relief:

7    A.    This action be certified as a class action pursuant to Rule 23 of the Federal Rules of

8    Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as

9    counsel for the Class;

10    B.    The conduct alleged herein be declared, adjudged and decreed to be unlawful;

11    C.    Plaintiffs and the Class be awarded statutory damages pursuant to RESPA § 8(d)(2),

12    12 U.S.C. § 2607(d)(2);

13    D.    An order granting Plaintiffs and the Class costs of suit, including reasonable

14    attorneys' fees and expenses; and

15    E.    An order granting Plaintiffs and the Class such other, further and different relief as

16    the nature of the case may require or as may be determined to be just, equitable and proper by this

17    Court.

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT
51403

16

1

## DEMAND FOR JURY TRIAL

2          Plaintiffs hereby demand a trial by jury as to all claims in this action.

3    Dated:  June 5, 2007                              Respectfully submitted,

4

5    _____
                                                       Alan R. Plutzik

6
                                                       SCHIFFRIN BARROWAY TOPAZ &
7                                                      KESSLER, LLP
                                                       Alan R. Plutzik, Of Counsel
8                                                      Robert M. Bramson, Of Counsel
                                                       2125 Oak Grove Blvd., Suite 120
9                                                      Walnut Creek, CA 94598
                                                       Telephone: (925) 945-0770
10                                                     Facsimile: (925) 945-8792

11                                                     -and-

12                                                     Joseph H. Meltzer, Esq.
13                                                     Edward W. Ciolko, Esq.
                                                       Mark K. Gyandoh, Esq.
14                                                     Joseph A. Weeden, Esq.
                                                       280 King of Prussia Road
15                                                     Radnor, PA   19087
                                                       Telephone: (610) 667-7706
16                                                     Facsimile: (610) 667-7056

17
                                                       BERKE, BERKE & BERKE
18                                                     Andrew L. Berke, Esq.
                                                       420 Frazier Avenue
19                                                     Chattanooga, TN  37402
                                                       Telephone: (423) 266-5171
20                                                     Facsimile: (423) 265-5307

21
                                                       TRAVIS & CALHOUN, P.C.
22                                                     Eric G. Calhoun, Esq.
                                                       1000 Providence Towers East
23                                                     5001 Spring Valley Road
                                                       Dallas, Texas  75244
24                                                     Telephone: (972) 934-4100
                                                       Facsimile: (972) 934-4101
25

26                                                     Attorneys for Plaintiffs

27

28

FIRST AMENDED COMPLAINT
51403

17